IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Deerfield Plantation Phase II-B Property Owners Association, Inc., | ) | Civil Action No.: 4:09-cv-01023-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| United States Army Corps of Engineers, Charleston District; Lt. General Robert L. Van Antwerp, *in his official capacity as Chief of Engineers, U.S. Army Corps of Engineers*; Lt. Colonel Trey Jordan, *in his official capacity as District Engineer, U.S. Army Corps of Engineers, Charleston District*; United States Environmental Protection Agency; Lisa P. Jackson, *in her official capacity as Administrator of the U.S. Environmental Protection Agency*; A. Stanley Meiburg, *in his official capacity as Acting Regional Administrator, Region IV, U.S. Environmental Protection Agency*; Deertrack Golf, Inc.; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

This case involves Deerfield Plantation Phase II-B Property Owners Association, Inc.'s ("Deerfield") challenge to a determination by the United States Army Corps of Engineers ("Corps") that it has jurisdiction and regulatory authority, under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, over only 0.37 acres (920.07 linear feet) of waters on property owned by Deertrack Golf, Inc. ("Deertrack") in Horry County, South Carolina. Deerfield contends that additional certain ponds and channels on this property should also be considered "waters of the United States" and thus subject to the Corps' jurisdiction and regulatory authority under the CWA. Pending before the court

are cross-motions for summary judgment.[1]  The court held a hearing on the motions on May 25, 2011, and the motions are ripe for adjudication.

### Background

Deertrack owns land in Horry County, South Carolina, including an 84.96-acre parcel known as the Old South Golf Course ("Deerfield Tract").  In or around 2005, Deertrack closed the Old South Golf Course and entered into a purchase contract with Bill Clark Homes of Myrtle Beach ("BCH") for the sale of the Deerfield Tract.  BCH intended to redevelop the Deerfield Tract as a residential subdivision.  In connection with this redevelopment plan, on February 13, 2006, a consultant for BCH submitted a request for a jurisdictional determination ("JD") by the Corps as to whether the Deerfield Tract contained "waters of the United States" subject to jurisdiction under Section 404 of the CWA. *See* Administrative Record ("A.R.") at 372.  On August 3, 2006, the Corps notified BCH that the Deerfield Tract did "not contain any wetland areas or other waters of the United States." *Id.* at 362.  That 2006 JD provided that it would be valid for five (5) years "unless new information warrant[ed] revision . . . before the expiration date." *Id.*

On April 16, 2009, Deerfield filed the instant suit against the Corps, the United States Environmental Protection Agency ("EPA"),[2] and Deertrack, which challenged the Corps' 2006 JD. *See* Compl. [Docket Entry 1] at 1.  On August 21, 2009, the parties jointly moved to voluntarily

---

[1] Deerfield Motion for Summ. J. [Docket Entry 52]; Deertrack Motion for Summ. J. [Docket Entry 57]; and Federal Defs. Motion for Summ. J. [Docket Entry 58].

[2] The [Docket Entry 1] Complaint also named as defendants the following: Lt. General Robert L. Van Antwerp, *in his official capacity as Chief of Engineers, U.S. Army Corps of Engineers*; Lt. Colonel Trey Jordan, *in his official capacity as District Engineer, U.S. Army Corps. of Engineers, Charleston District*; Lisa P. Jackson, *in her official capacity as Administrator of the U.S. Environmental Protection Agency*; and A. Stanley Meiburg, *in his official capacity as Acting Regional Administrator, Region IV, U.S. Environmental Protection Agency*.  These individual persons, along with the Corps and EPA, are referred to in this Order as the "Federal Defendants."

remand the action so that the Corps could "reconsider" its 2006 JD. *See* Joint Motion to Remand [Docket Entry 32]. The court granted that motion on the same date. *See* Aug. 21, 2009 Order [Docket Entry 33].

On March 17, 2010, the Corps issued the superseding JD ("2010 JD") that is at issue in these cross-motions for summary judgment and subject to review in this case.

## **Statutory and Regulatory Background**

I.     The Clean Water Act

"Congress passed the CWA in 1972 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Precon Dev. Corp. v. U.S. Army Corps of Eng'rs*, 633 F.3d 278, 287 (4th Cir. 2011) (quoting 33 U.S.C. § 1251. To achieve that objective, the CWA prohibits the "discharge of any pollutant" into navigable waters. 33 U.S.C. § 1311(a); *see also id.* § 1362(12). Section 404 of the CWA requires a permit for "discharge of dredged or fill material into the navigable waters." *Id.* § 1344(a). The term "navigable waters" is defined by the CWA as "the waters of the United States." *Id.* § 1362(7).

The Corps and EPA share responsibility for implementing and enforcing the CWA, and both have defined the term "waters of the United States" in substantially equivalent terms. *See* 33 C.F.R. § 328.3(a) (Corps definition); 40 C.F.R. § 230.3(s) (EPA definition).[3] The Corps has specifically defined "waters of the United States" to include the following:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide ["traditional navigable waters"];

(2) All interstate waters including interstate wetlands;

---

[3] For simplicity reasons, the court will hereinafter cite to only the Corps' regulations.

3

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(I) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a)(1) through (4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this section.

33 C.F.R. § 328.3(a).

Wetlands are defined as "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." *Id.* § 328.3(b). "Adjacent" wetlands are ones "bordering, contiguous, or neighboring" other jurisdictional waters, and include "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like." *Id.* § 328.3(c).

The Corps' regulations authorize the Corps, upon request, to provide the agency's view on whether a particular property contains "waters of the United States" within the agency's regulatory jurisdiction under the CWA. *See id.* §§ 320.1(a)(6), 331.2. The process results in a written

4

"jurisdictional determination" that outlines the geographic extent of wetlands or water-bodies on a site that are within the Corps' regulatory jurisdiction. *See id.* §§ 320.1(a), 331.2.

II.     Supreme Court Case Law

In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), the United States Supreme Court held that Congress had included a broad definition of "navigable waters" in the CWA, "evidently intend[ing] to . . . exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Id.* at 133.

The Supreme Court again interpreted the CWA term "navigable waters" in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"). In *SWANCC*, the Supreme Court considered whether "isolated ponds, some only seasonal, wholly located within two Illinois counties, f[e]ll under § 404(a)'s definition of 'navigable waters' because they serve[d] as habitat for migratory birds." *Id.* at 171-72. The Court concluded that these ponds were not "navigable waters," refusing to "hold that the jurisdiction of the Corps extend[ed] to ponds that are *not* adjacent to open water." *Id.* at 168. The Court further noted that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed [its] reading of the CWA in *Riverside* . . . ." *Id.* at 167.

Most recently, the Supreme Court interpreted the term "waters of the United States" in *Rapanos v. United States*, 547 U.S. 715 (2006). *Rapanos* involved consolidated cases in which the CWA had been applied to "four Michigan wetlands, which lie near ditches or man-made drains that eventually empt[ied] into traditional navigable waters." *Id.* at 729 (plurality opinion). The Court was required "to decide whether the term 'navigable waters' in the Clean Water Act extend[ed] to

5

wetlands that d[id] not contain and [were] not adjacent to waters that [were] navigable in fact." *Id.* at 759 (Kennedy, J., concurring). While all members of the Court reaffirmed that the term "waters of the United States" encompasses some waters that are not navigable in the traditional sense,"[4] the "fractured Court proposed two different ways to limit the reach of its earlier [*Riverside*] ruling so as not to allow jurisdiction over wetlands lying alongside 'remote and insubstantial' ditches and drains," *Precon Dev. Corp.*, 633 F.3d at 288 (quoting *Rapanos*, 547 U.S. at 778 (Kennedy, J., concurring)).

The four-Justice plurality, as authored by Justice Scalia, began by interpreting "the phrase 'the waters of the United States' [to] include[] only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams, . . . oceans, rivers, [and] lakes.'" *Rapanos*, 547 U.S. at 739 (citation omitted) (plurality opinion). The plurality further indicated that these "navigable waters," i.e., streams, oceans, rivers, and lakes, are "continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows." *Id.* at 733 (plurality opinion). Moreover, the Court noted that "[e]ven the least substantial of the definition's terms, namely, 'streams,' connotes a continuous flow of water in a permanent channel[;] . . . [n]one of these terms encompasses transitory puddles or ephemeral flows of water."[5] *Id.* (plurality opinion). Applying this interpretation to wetlands, the plurality concluded that "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so

---

[4] *See id.* at 731 (plurality opinion); *id.* at 767-78 (Kennedy, J., concurring); *id.* at 793 (Stevens, J., dissenting).

[5] The plurality similarly noted that "relatively continuous flow is a *necessary* condition for qualification as a 'water[.]'" *Id.* at 736 n.7 (plurality opinion).

that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the [CWA]." *Id.* at 742 (plurality opinion). "Wetlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States' . . . lack the necessary connection to covered waters." *Id.* (plurality opinion). Thus, the plurality set forth two requirements that must be met for *an adjacent* wetland to be covered by the CWA:

> first, . . . the adjacent channel [must] contain[] a "wate[r] of the United States," (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, . . . the wetland [must] ha[ve] a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.

*Id.* at 742 (plurality opinion).

Justice Kennedy, in his concurrence, found the plurality's test to be too limiting. *See id.* at 778 (noting that "the plurality reads nonexistent requirements into the [CWA]") (Kennedy, J., concurring). Citing *SWANCC*, Justice Kennedy wrote that the applicable test for determining whether or not a "water or wetland" is "navigable" is the "significant nexus" test. *Id.* at 759 (quoting *SWANCC*, 531 U.S. at 167, 172) (Kennedy, J., concurring). Under that test, in order to be "navigable" under the CWA, "a water or wetland must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* (Kennedy, J., concurring). Turning his attention to the wetlands involved in *Rapanos*, Justice Kennedy concluded that "wetlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780 (Kennedy, J., concurring). To the contrary, "[w]hen . . . wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly

encompassed by the statutory term 'navigable waters.'" *Id.* (Kennedy, J., concurring). Justice Kennedy further advised that "[w]hen the Corps seeks to regulate wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to establish its jurisdiction. . . . however, the Corps must establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries." *Id.* at 782 (Kennedy, J., concurring).

Justice Stevens indicated in his dissent that the four dissenting Justices would uphold CWA jurisdiction in all cases in which either the plurality's "relatively permanent" test or Justice Kennedy's "significant nexus" test is met. *See id.* at 810 (Stevens J., dissenting). Specifically, Justice Stevens wrote:

> Given that all four Justices who have joined this [dissenting] opinion would uphold the Corps' jurisdiction in both of these cases–and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied–on remand each of the judgments should be reinstated if *either* of those tests is met.

*Id.* (Stevens, J., dissenting).

The Fourth Circuit has not had occasion to identify the controlling rule of law on the meaning of the term "waters of the United States" that emerged from the *Rapanos* decision.[6] In our case, however, all parties are in agreement that if either test is met–the plurality's "relatively permanent" test or Justice Kennedy's "significant nexus" test–then the waters located on the Deerfield Tract fall under the jurisdiction of the CWA.[7] Accordingly, the undersigned is not required to determine which

---

[6] The Fourth Circuit addressed the *Rapanos* decision in *Precon Development Corp.*, 633 F.3d 278. However, in *Precon*, the parties stipulated that Justice Kennedy's "significant nexus" test governed. *See id.* at 288. Therefore, the Fourth Circuit stated that it "d[id] not address the issue of whether the plurality's 'continuous surface connection' test provide[d] an alternate ground upon which CWA jurisdiction [could] be established." *Id.*

[7] *See* Deerfield Memo. in Supp. of Summ. J. [Docket Entry 52-1] at 14 ("[S]ubmit[ting] that the Corps has jurisdiction over a body of water if either of the <u>Rapanos</u> standards is met."); Federal Defendants Motion for Summ. J. at 11 n.7 ("The United States agrees that it may establish [CWA] coverage of a particular

*Rapanos* test is controlling to the exclusion of the other for purposes of this case–if either test is satisfied, CWA jurisdiction exists.

III.     The Rapanos Guidance

After the Supreme Court issued its decision in *Rapanos*, the Corps and EPA prepared the [Docket Entry 58-1] Rapanos Guidance (the "Guidance"),[8] which "instructs the Corps and EPA personnel on how to make jurisdictional determinations that comply with the new rules for CWA jurisdiction announced by the Supreme Court in *Rapanos*." *Precon Dev. Corp.*, 633 F.3d at 283. The Guidance "focuses only on those provisions of the agencies' regulations at issue in Rapanos"–i.e., "33 C.F.R. §§ 328.3(a)(1), (a)(5), and (a)(7)"– and states that "regulatory jurisdiction under the CWA exists over a water body if either the plurality's or Justice Kennedy's standard is satisfied." Guidance at 3, 4 n.18.

The Guidance began by instructing that the EPA and Corps would continue to assert jurisdiction over all "traditional navigable waters, which includes all the waters described in 33 C.F.R. §§ 328.3(a)(1), and 40 C.F.R. § 230.3(s)(1)." *Id.* at 4.  Similarly, the Guidance indicated that the *Rapanos* decision left unchanged the Corps' continued assertion of jurisdiction "over wetlands adjacent to traditional navigable waters, including over adjacent wetlands that do not have a continuous surface connection to traditional navigable waters." *Id.* at 4-5.

With respect to the plurality opinion, the Guidance provides that "[t]he agencies will assert jurisdiction over non-navigable tributaries of traditional navigable waters that are relatively

---

water body by demonstrating either a 'significant nexus' to traditional navigable waters within the meaning of Justice Kennedy's *Rapanos* concurrence or by satisfying the *Rapanos* plurality standard.").

[8] The Rapanos Guidance is also contained in the Administrative Record, pages 409 to 421.

permanent where the tributaries typically flow year round or have continuous flow at least seasonally," *id.* at 6, and further that "[t]he agencies will assert jurisdiction over those adjacent wetlands that have a continuous surface connection to such tributaries." *Id.* For purposes of analyzing those tributaries, the Guidance instructs that "'relatively permanent' waters do not include ephemeral tributaries which flow only in response to precipitation and intermittent streams which do not typically flow year-round[.]" *Id.* at 7. Rather, those types of non-permanent tributaries are to be evaluated under the "significant nexus" standard. *Id.*

With respect to Justice Kennedy's "significant nexus" test, the Guidance provides that "[t]he agencies will assert jurisdiction over non-navigable, not relatively permanent tributaries and their adjacent wetlands where such tributaries and wetlands have a significant nexus to a traditional navigable water." *Id.* at 8. Per the Guidance, the "significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by any wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters." *Id.* In addition, the Guidance indicates that a significant nexus analysis will consider "hydrologic factors" and "ecologic factors." *Id.* "Hydrologic factors" include, among other factors, "volume, duration, and frequency of flow, including consideration of certain physical characteristics of the tributary," and "proximity to the traditional navigable water." *Id.* "Ecologic factors" include, among other factors, "potential of tributaries to carry pollutants and flood waters to traditional navigable waters" and "potential of wetlands to trap and filter pollutants or store flood waters maintenance of water quality in traditional navigable waters." *Id.* Finally, the Guidance noted that "[t]he following geographic features generally are not jurisdictional waters: swales or erosional features (e.g., gullies, small washes

10

characterized by low volume, infrequent, or short duration of flow) [and] ditches . . . excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water." *Id.*

### 2010 Jurisdictional Determination

The Corps issued its 2010 JD on March 17, 2010. *See* Am. Compl. [Docket Entry 43] at 2, 9. The 2010 JD consists of three "approved jurisdictional determination forms," A.R. at 12-34, an eight-page memorandum explaining the Corps' findings, *id.* at 1-8, and multiple pictures taken by the Corps during its site inspections of the Deerfield Tract, *id.* at 36-38.[9]

The 2010 JD addressed 84.96 acres[10] of the Old South Golf Course ("Deerfield Tract"), and ultimately asserted CWA jurisdiction over two channels on the Deerfield Tract that totaled 920.07 linear feet (or approximately 0.37 acres). *Id.* at 2. These "waters of the United States" are shaded on the map appended to the 2010 JD. *Id.* at 10. "Tommy Fennel, Supervisory Biologist and Chief of Northeast Branch of the Corps' Charleston District, performed the new jurisdictional determination for [the Deerfield Tract]." *Id.* at 1.

In making its 2010 JD, the Corps first reviewed "infrared, aerial photography from 1994, 1999, and 2006 [which] reveal[ed] that the Deerfield Tract [was] a golf course with associated lakes/ponds." *Id.* at 3; *see also id.* at 387, 399-400. The Corps then reviewed its own records, which indicated that "construction associated with the golf course on [the Deerfield Tract] was likely performed prior to regulation under the [CWA]." *Id.* at 3. The Corps next reviewed the United

---

[9] The court notes that the Administrative Record also includes scientific literature, A.R. at 584-623, guidance documents, *id.* at 409-583, and documentation provided by Deerfield to the Corps, *id.* at 47-357.

[10] The parties agreed during the hearing that although the 2010 JD relates to the approximately 84.96 acres comprising the Deerfield Tract, the majority of those acres are dry land which Deerfield concedes is not subject to jurisdiction under the CWA. Rather, only those remaining *water features* on the Deerfield Tract are truly at issue in this matter.

States Department of Agriculture's Soil Survey for Horry County. *Id.* The Soil Survey indicated the "potential presence of hydric soils onsite," which could have been "an indicator that wetlands or other jurisdictional waters [were] present on the site." *Id.* However, due to the age of the survey, which was prepared in 1974, the Corps noted that "this information [was] not conclusive that hydric soils [were] currently present on this tract." *Id.* The Corps next reviewed the most recent United States Geological Survey for Surfside Beach, prepared in 1984, "which revealed that the tract did not contain any evidence of wetlands or waters." *Id.* The Surfside Survey did have the words "golf course" handwritten over the Deerfield Tract, which "suggested [to the Corps] that this area had been a golf course for some period of time." *Id.* The Corps also reviewed the United States Fish and Wildlife Service's "National Wetland Inventory Map for Surfside Beach," and noted that it indicated the Deerfield Tract did not contain "wetlands or water features except for open water ponds." *Id.* An overlay analysis performed by Fennel "revealed that the Soil Survey depicted certain areas as potential wetlands, but the same areas were depicted as upland, or dry land, on the Surfside Beach Quad and the Surfside Beach NWI." *Id.* The 2010 JD noted that this "conflict [was] likely due to changes in the area from the construction of the golf course and surrounding residential community." *Id.*

    To resolve any conflicts, Fennel, the Corps' supervisory biologist, conducted two on-site inspections of the Deerfield Tract, accompanied by Mike Wylie, an EPA wetlands expert,[11] on one of the visits. *Id.* at 4, 661-62. The first site visit occurred on December 7, 2009, and the second on

---

[11] The Federal Defendants represented at the hearing that Wylie is an EPA wetlands enforcement expert. Moreover, the court notes that Wylie's observations, on behalf of the EPA, appear to be consistent with the Corps' observations and findings in all material respects. *Compare* A.R. at 662 (Wylie's Memorandum) *with* A.R. at 1-8 (Corp's Memorandum Asserting Jurisdiction).

January 6, 2010. *Id.* at 4. The 2010 JD noted the following from the site visits:

> The methodology used to prepare the site to construct the golf course . . . led to such significant alteration that the Corps could not conclusively determine whether the site was ever a wetland. Furthermore, Mr. Fennel did not observe any relic hydrophytic vegetation that would indicate whether this site historically contained wetlands. If the delineated portions of the Deerfield Tract contained wetlands at some point, such wetlands were likely filled prior to regulation under the [CWA].

*Id.*

I.    Jurisdictional "Waters"

In the 2010 JD, the Corps concluded that two non-navigable tributaries of the Atlantic Ocean located on the Deerfield Tract–i.e., the 0.37 acres (920.07 linear feet)–were "waters of the United States." *Id.* at 4-6. The first jurisdictional tributary[12] "flows offsite through a box culvert . . . continuing through a stormwater detention pond and into a culvert . . . under U.S. Highway 17 to Dogwood Lake. Dogwood Lake is a . . . 'water of the United States.' The flow then continues directly into the Atlantic Ocean, a traditional navigable water." *Id.* at 5. The Corps began by noting that this tributary "had a firm, sandy bottom with a clearly defined channel that was free of vegetation" and "it was evident that a steady influx of groundwater contributed to the constant recharge and flow," which "are strong indicators of a relatively permanent flow." *Id.* at 4.

"In addition, Mr. Fennel observed a clearly defined ordinary high water mark present in the area where the tributary contained a clearly defined channel," which is another indicator of "relatively permanent flow." *Id.* Specifically, Fennel observed the following: "a clear natural line impressed on the bank," an "absence of terrestrial vegetation within the . . . channel," and "the presence of litter and debris being transported downstream." *Id.* Similarly, the 2010 JD indicated

---

[12] Referred to in the 2010 JD as "Relatively Permanent Water (Attachment A at L1-L7, L13-37)." A.R. at 4; *see also id.* at 10.

that Fennel observed red-staining along the banks of the tributary, which "is the direct result of iron-oxidizing bacteria" which suggests "the tributary was being recharged from groundwater." *Id.* at 5. Finally, the 2010 JD noted the "sinuosity of the channel" as "indicative of relatively permanent flow." *Id.*   Accordingly, the Corps concluded that this tributary was jurisdictional under the plurality's test, based on its "continuous flow and . . . surface connection with the Atlantic Ocean." *Id.*

The second tributary[13] that the Corps determined to be jurisdictional "flows into the jurisdictional tributary discussed above and connects with the Atlantic Ocean." *Id.*  Fennel noted that this tributary similarly featured "flowing water, a well-defined channel with a firm, sandy bottom and a well-defined ordinary high water mark." *Id.*  Fennel also noted the "absence of vegetation within the channel[]," as well as other "geomorphic indicators including groundwater influx, the red stained vegetation . . . within the tributary, [and] the sinuosity of the channel." *Id.*  Therefore, the Corps concluded that this tributary was "subject to the Corps' jurisdiction under the [CWA]" based on its "perennial flow regime and a surface connection with the Atlantic Ocean." *Id.* at 6.  However, the Corps concluded that "the reach of the continuous flow ceased in the area where there was an abrupt change in the amount of plant life . . . with abundant vegetation in the tributary's channel." *Id.*  Upstream from this point, the Corps observed that "vegetation was thick and prevalent," "the channel lacked an ordinary high water mark, and there was no evidence of influence by the influx of groundwater," and therefore the Corps concluded that "there was no continuous flow or relatively permanent flow" in those portions of the tributary. *Id.*   Thus, the Corps concluded that the

---

[13] Referred to in the 2010 JD as "Relatively Permanent Water (Attachment A at L8-L12)." A.R. at 5; *see also id.* at 10.

jurisdictional reach of the second tributary ceased at point L10, where the above changes were observed. *Id.* at 6, 10.

II.    Non-Jurisdictional Ditches, Ponds, and Swales

While the Corps determined in the 2010 JD that the above two tributaries were jurisdictional, the Corps concluded that the remaining water bodies on the Deerfield Tract were not "waters of the United States." *Id.* at 6-8.  "The remaining water features on the delineated portion of the Deerfield Tract are a series of ponds that are interconnected by a series of ditches and swales." *Id.* at 6.  The Corps began by noting that it "generally does not consider swales or ditches that are excavated wholly in uplands and that do not carry a relatively permanent flow to be jurisdictional," nor does it "consider small, ornamental waterbodies to be 'waters of the United States' if the artificial features are created by excavating wholly from uplands to retain water primarily for aesthetic reasons." *Id.* at 6-7; *see also* Guidance at 8-13.  Here, the Corps concluded that these "remaining water features" did "not have a significant nexus to a traditional navigable water because of the low volume, duration and frequency of water flow to the jurisdictional relatively permanent tributary." A.R. at 6.

Specifically, as to the ditches and swales, Fennel observed a "prevalence of vegetation," a lack of an ordinary high water mark, and a lack of sinuosity. *Id.* at 6-7.  In addition, Fennel noted that "these ditch and swale features convey[ed] water from ponds and surrounding upland areas during and following storm events and there [was] no evidence of groundwater recharge." *Id.* at 7.  Based on these observations, the Corps concluded that "these ditches and swales contain[ed] . . . a low volume, duration and frequency of water flow, and d[id] not have an ordinary high water mark," therefore, they were not "waters of the United States." *Id.*

15

With respect to the ponds, the Corps concluded that they were "man-made in uplands" and that there "was no evidence of existent or remnant wetlands or tributaries" on the Deerfield Tract. *Id.* Based on Fennel's on-site observations, the Corps also concluded that the "artificial ponds were likely constructed for the purpose of retaining water because the culverts that connected the ponds to the swales and ditches were elevated and constructed to maintain a certain water level and would flow only if the pond levels fluctuated above a certain point," and that the ponds retained water "primarily for aesthetic reasons associated with typical golf course design." *Id.* Thus, the Corps concluded that "these ponds drain to ditches . . . that contain such a low volume, duration and frequency of water flow, [that] these ponds do not have a significant nexus that would warrant departing from the Corps['] policy that such areas generally are not 'waters of the United States.'" *Id.*

### Standard of Review

"Claims challenging federal agency action under the CWA . . . are subject to judicial review under the [Administrative Procedures Act (APA)]." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citing 5 U.S.C. § 702). Under the APA, "agency action, findings, and conclusions" will be set aside only when they are "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Ohio Valley Envtl. Coal.*, 556 F.3d at 192. "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal.*, 556 F.3d at 192; *see also Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993). "Especially in matters involving not just simple findings of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'"*Ohio Valley Envtl. Coal.*, 556 F.3d at 192

16

(quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983)).

"In determining whether agency action was arbitrary and capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Id.* at 192 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416. "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Ohio Valley Envtl. Coal.*, 556 F.3d at 192 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., Co.*, 463 U.S. 29, 43 (1983) (internal quotations and citations omitted)). Moreover, "'[a]gencies are entitled to select their own methodology as long as that methodology is reasonable,' and [the court] must defer to such agency choices." *Id.* at 201 (quoting *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999)). Nonetheless, the court will vacate an agency's decision if it

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43).

### Discussion

At first glance, this appears to be an unusual case. Parties generally challenge determinations of the Corps where the Corps has affirmatively asserted regulatory jurisdiction over water bodies

17

owned by those parties. *See*, *e.g.*, *Precon Dev. Corp.*, 633 F.3d at 281.  Here, however, Deerfield brought this action because the Corp is refusing to assert jurisdiction over the majority of the water bodies located on the Deerfield Tract.

All parties have filed cross-motions for summary judgment.  Deerfield contends that the Corps' 2010 JD was arbitrary and capricious, asserting three main arguments: the Corps inappropriately focused solely on "flow," the Corps failed to conduct an appropriate "significant nexus" test, and the Corps arbitrarily decided to terminate jurisdiction mid-channel.  The Federal Defendants, on the other hand, maintain that the 2010 JD was accurate, well-reasoned, and not arbitrary and capricious.  Finally, Deertrack argues that the court lacks jurisdiction to review the Corps' 2010 JD.

The United States Supreme Court has explained that "the Corps must necessarily choose some point at which water ends and land begins." *Riverside Bayview Homes, Inc.*, 474 U.S. at 132. The Court has further noted that this is "no easy task" and "the transition from water to solid ground is not necessarily or even typically an abrupt one." *Id.*  Upon review, for the reasons set out below, the court finds that it has subject-matter jurisdiction to address the merits of this case, and, as to the merits, the court finds that Deerfield has failed to establish that the Corps arbitrarily and capriciously determined the point on the Deerfield Tract "at which water ends and land begins."[14]

---

[14] In its Amended Complaint, Deerfield alleged that the EPA was liable under the CWA because it "fail[ed] to override or block the Corps' refusal to assert CWA jurisdiction over all of the Deertrack Golf waters and wetlands." Am. Compl. at 14-15.  The Federal Defendants argue that Deerfield "has abandoned any claim it may have had against EPA" and therefore summary judgment should be granted in the EPA's favor. Federal Defendants Motion for Summ. J. at 20.  In the alternative, the Federal Defendants contend the court "should conclude that EPA satisfied any duty it might have had to ensure that the Corps issued a reasonable jurisdictional determination in this case." *Id.* at 21.  Accordingly, regardless of whether Deerfield abandoned any such claim and because the court ultimately concludes in this matter that the Corps' 2010 JD was not arbitrary and capricious, summary judgment should be granted in favor of the EPA on the basis that it has satisfied any duty it might have had to ensure that the Corps issued a reasonable JD in this case.

I.    Jurisdiction for Judicial Review

Deertrack argues that the 2010 JD issued by the Corps was not a final agency action and that Deerfield cannot show that the Corps failed to perform any nondiscretionary act or duty under the CWA, and thus Deertrack contends the court lacks subject-matter jurisdiction over this matter.

In its Motion for Summary, Deertrack cited *Fairbanks North Star Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586 (9th Cir. 2008), and argued that the court should dismiss this action because the Corps' 2010 JD did not constitute final agency action.[15]  Deerfield responded that the Corps' determination did constitute final agency action, and, upon review, the court agrees.

In *Fairbanks*, the Ninth Circuit concluded that the district court did not have jurisdiction to review the Corps' approved jurisdictional determination that Fairbank's property contained wetlands subject to CWA regulatory jurisdiction.  The case *sub judice* is distinguishable from *Fairbanks*.  In *Fairbanks*, the Ninth Circuit Court of Appeals held that "the Corps' issuance of an approved jurisdictional determination finding that . . . property contained waters of the United States did not constitute final agency action under the APA for purposes of judicial review." *Id.* at 591.  Specifically, the Ninth Circuit concluded that the Corps' determination that the property in question did contain wetlands subject to CWA regulatory jurisdiction was not final agency action because it did "not impose an obligation, deny a right or fix some legal relationship." *Id.* at 597.  Rather, that court held that the "affirmative finding simply put[] Fairbanks on notice that the Corps believe[d] a permit [would be] necessary if Fairbanks decide[d] to proceed with its project." *Id.*  Here, while the Corps did find 0.37 acres of "waters of the United States" on the Deerfield Tract, the Corps determined the majority of the acreage to be non-jurisdictional.  Therefore, the portion of the 2010

---

[15] The court notes that the Federal Defendants did not join in Deertrack's summary judgment motion.

JD challenged by Deerfield was not an "affirmative" determination as in *Fairbanks*, but a "negative" determination. Even the Ninth Circuit in *Fairbanks* recognized the difference, noting that "[w]hether a Corps finding that a property is not subject to regulatory jurisdiction under the CWA would constitute final agency action is beside the point here . . . ." *Id.* The undersigned is persuaded that legal consequences do flow from the Corps' 2010 JD ("negative" determination), as any developer of the property could conceivably immediately begin to fill and dredge the eighty-plus acres that the Corps determined to be non-jurisdictional.

Moreover, in *National Wildlife Federation v. Hanson*, 859 F.2d 313 (4th Cir. 1988), the Fourth Circuit considered an award of attorney's fees to a group of plaintiffs "who challenged the Corps' determination that two tracts of land in North Carolina were *not* wetlands under . . . the [CWA]." *Id.* at 315 (emphasis added). In analyzing the attorney's fees award, the Fourth Circuit noted that "[t]he district court's review of the Corps' wetlands determination under APA standards was proper and did not alter the jurisdictional base of the court's judgment." *Id.* at 316. While admitting at the hearing that *Hanson* contained language favorable to Deerfield, Deertrack argued that this language should be considered as only dicta. Notwithstanding Deertrack's contention, the court is persuaded that the applicable Fourth Circuit precedent suggests that subject-matter jurisdiction exists over Deerfield's claims.[16]

---

[16] Deertrack also contends that this court lacks jurisdiction because Deerfield cannot sustain its claim under 33 U.S.C. § 1365, arguing that Deerfield cannot show that the Corps has failed to perform a nondiscretionary act or duty under the CWA. However, this argument appears to be contradicted by *Hanson*, in which the Fourth Circuit concluded that "[t]he Corps has the nondiscretionary duty to regulate dredged or fill material, and to fulfill that duty it must make reasoned wetlands determinations. The Corps has a mandatory duty to ascertain the relevant facts, correctly construe the applicable statutes and regulations, and properly apply the law to the facts." *Hanson*, 859 F.2d at 315-16 (internal citations omitted); *see also Envtl. Defense Fund v. Tidwell*, 837 F. Supp. 1344, 1354 (E.D.N.C. 1992) ("[T]he Fourth Circuit determined [in *Hanson*] that the Corps' responsibility to regulate dredged or fill material . . . is a non-discretionary duty . . . [and] [t]herefore . . . [the EPA's and Corps'] actions ruling that certain lands did not constitute wetlands were non-discretionary duties.").

Thus, for the reasons discussed above, the court finds that it has subject-matter jurisdiction over this matter and denies Deertrack's Motion for Summary Judgment on that basis.[17]

II.     Merits

    a.     Relatively Permanent Waters

The plurality in *Rapanos* held that the "phrase 'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" *Rapanos*, 547 U.S. at 739 (internal citation omitted) (plurality opinion).  Accordingly, the Rapanos Guidance provides that the Corps "will assert jurisdiction over non-navigable tributaries of traditional navigable waters that are *relatively permanent* where the tributaries typically flow year-round or have continuous flow at least seasonally," as well as over "those adjacent wetlands that have a continuous surface connection to such tributaries." Guidance at 6 (emphasis added).  Here, the Corps reasonably interpreted existing case law, regulations, and guidance documents, and permissibly concluded that only two of the water bodies on the Deerfield Tract were jurisdictional under the plurality's test.

The Corps reasonably concluded that the ditches, ponds, and swales on the Deerfield Tract were excavated wholly from and drain only to uplands. *See* A.R. at 7-8.  The Corps reached this conclusion after conducting two on-site inspections and reviewing infrared, aerial photographs, topographic maps, a soil survey, and an inventory of wetlands in Horry County.  While the court

---

[17] In its [59] Memorandum in Opposition to Deerfield's summary judgment motion, Deertrack also argues, as do the Federal Defendants, that the 2010 JD was not arbitrary and capricious.  Specifically, Deertrack argued that "[t]he requirements articulated by the United States Supreme Court were satisfied by the Corps in the 2010 JD.  The Corps' action is entitled to deference.  Moreover, the Corps fully considered whether the water features on the [Deerfield Tract] had a significant nexus to other waters and whether the water features on the [Deerfield Tract] had relatively permanent flow." Deertrack Memo. in Opp. at 25.

notes, as did the Corps, that a soil survey prepared in 1974 indicated the possible presence of hydric soils at that time, which is one indicator of wetlands, the Corps acted reasonably in determining that this evidence was "not conclusive" as to the current presence of wetlands on the Deerfield Tract, especially in light of the other evidence.  Specifically, these potential wetlands "were depicted as upland, or dry land, on the Surfside Beach Quad and the Surfside Beach NWI." *Id.* at 3.  More importantly, the Corps' supervisory biologist, Fennel, did not find any "relic hydrophytic vegetation" or any "evidence of existent or remnant wetlands or tributaries in the review area" during the two on-site inspections.[18] *Id.* at 3, 7.  Wylie, an EPA wetlands enforcement expert, accompanied the Corps on the second inspection and oversaw this matter for the EPA. *See id.* at 4, 661-662.  Wylie's observations were consistent with the Corps' observations, and he specifically noted that "[t]he ponds appeared to be constructed in uplands with no wetland connections." *Id.* at 662.  Given this

---

[18] Plaintiff provided deposition testimony of its own environmental expert, Jake Duncan, who concluded that the Deerfield Tract was excavated, at least partially, from wetlands.  This testimony contradicts the above observations and findings of Fennel and Wylie.  Duncan inspected the Deerfield Tract and performed several soil borings, detecting the presence of hydric soils in areas where the ponds were constructed.  Duncan concluded, based on what he considered "over whelming evidence of soil borings," that the ponds "were clearly excavated and constructed out of wetlands and should be considered jurisdictional." A.R. at 224.  Fennel was aware of the possibility of hydric soils in the vicinity of the ponds, based on a review of the 1974 soil surveys for the area.  However, Fennel was also knowledgeable, as was Duncan, of the extensive land disturbance that occurred during construction of the golf course on the Deerfield Tract. *See id.* at 4, 246-47.  The Corps concluded that the "methodology used to prepare the site to construct the golf course (which [] typically involves site clearing, elevation manipulation, and backfill) led to such significant alteration that the Corps could not conclusively determine whether the site was ever a wetland.  Furthermore, Mr. Fennel did not observe any relic hydrophytic vegetation that would indicate whether this site historically contained wetlands.  If the delineated portions of the Deerfield Tract contained wetlands at some point, such wetlands were likely filled prior to regulation under the [CWA]." *Id.* at 4.
     "When presented with conflicting evidence, courts must generally defer to the agency evaluation because 'an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" *Ohio Valley Envtl. Coal.*, 556 F.3d at 201 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).  Similarly, "[a]gencies are entitled to select their own methodology as long as that methodology is reasonable." *Id.* at 201 (quoting *Hughes River Watershed Conservancy*, 165 F.3d at 289-90); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1244 (9th Cir. 2005) (finding, in the context of a NEPA challenge, that because the Forest Service had provided a "thorough and reasoned explanation" for its position, the court would not "take sides in a battle of the experts" (internal quotations omitted)).  Accordingly, the court finds that the Corps reasonably relied on its own two experts/specialists in making its determinations.

evidence, the court finds that the Corps' conclusion that the ponds, ditches, and swales were excavated entirely in uplands was not arbitrary or capricious.

Once the Corps made that determination, it acted reasonably in applying its longstanding interpretation of its regulations and concluding that the remaining ditches, swales, and ponds were not "waters of the United States." As to the ponds, the Corps' regulations provide that the agency generally does not assert jurisdiction over "small ornamental bodies of water created by excavating and/or diking dry land to retain water for primarily aesthetic reasons." 51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986). Here, the Corps reasonably concluded that "the artificial ponds were likely constructed for purpose of retaining water" and "retained water primarily for aesthetic reasons associated with typical golf course design, construction and operation," i.e., man-made water hazards on a golf course. A.R. at 7. Similarly, the Rapanos Guidance provides that

> [s]wales . . . are generally not waters of the United States because they are not tributaries or they do not have a significant nexus to downstream traditional navigable waters. In addition, ditches . . . excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water are generally not waters of the United States because they are not tributaries or they do not have a significant nexus to downstream traditional navigable waters.

Guidance at 11-12 (citing 51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986)). Here, as discussed above, the Corps reasonably determined that these swales and ditches were excavated wholly in uplands and were not themselves "waters of the United States." A.R. at 6-7. The court concludes that there was nothing arbitrary and capricious about the Corps' interpretation and application of its regulations in this case relating to the remaining ditches, swales, and ponds. *See Precon Dev. Corp.*, 633 F.3d at 290 (recognizing that the Corps' "interpretation and application" of the *Rapanos* tests are entitled deference).

Deerfield, however, argues that the remaining ditches, swales, and ponds meet the plurality's "relatively permanent" test for jurisdiction.   Specifically, Deerfield contends that the Corps inappropriately relied solely on "flow" characteristics in making its determination under the plurality's test, arguing that "[r]ate of flow is irrelevant to the plurality's relatively permanent waters test." Deerfield Memo. in Supp. of Summ. J. at 26.  Deerfield further contends that the presence of "standing" water in the remaining ditches, swales, and ponds is sufficient to meet the "relatively permanent" test for jurisdiction under the CWA.  The court finds Deerfield's arguments are without merit.

While the *Rapanos* plurality did hold that "relatively permanent, standing or continuing flowing bodies of water" are jurisdictional "waters of the United States," the plurality's analysis thereafter necessarily included "flow" as a factor. *Rapanos*, 547 U.S. at 732 (plurality opinion).  The plurality noted that "[e]ven the least substantial of the definition's terms [(streams, oceans, lakes, and rivers)], namely, 'streams,' connotes a continuous *flow* of water in a permanent channel." *Id.* at 733 (plurality opinion) (emphasis added).   The plurality continued, "[n]one of these terms encompasses transitory puddles or ephemeral *flows* of water," or "ordinarily dry channels through which water occasionally or intermittently *flows*." *Id.* (plurality opinion) (emphasis added).  Finally, the plurality indicated in a footnote that "relatively continuous *flow* is a necessary condition for qualification as a 'water.'" *Id.* at 736 n.7 (plurality opinion) (emphasis added).  Similarly, the Rapanos Guidance indicates that waters are relatively permanent "where the tributaries typically *flow* year-round or have continuous *flow* at least seasonally." Guidance at 6 (emphasis added).  In addition, the Guidance explains that "'relatively permanent' waters do not include ephemeral tributaries which *flow* only in response to precipitation and intermittent streams which do not

typically *flow* year-round or have continuous *flow* at least seasonally."[19] *Id.* at 7 (emphasis added).

Here, the Corps' consideration of flow was not unreasonable or inappropriate. As discussed above, the plurality in *Rapanos* necessarily included "flow" as a factor to be considered in its "relatively permanent" waters test, and therefore it was reasonable for the Corps to analyze the "flow" of the remaining waters on the Deerfield Tract. *See Precon Dev. Corp.*, 633 F.3d at 290 (recognizing that the Corps' "interpretation and application" of the *Rapanos* tests are entitled deference). Moreover, the court finds that the Corps reasonably concluded that these remaining ditches, swales, and ponds were not "waters of the United States" under the plurality's standard after analyzing their "flow." While the court does note that Deerfield has presented evidence of the presence of "standing" water in these ditches, swales, and ponds, the Corps, based on Fennel's and the EPA wetlands expert's observations during the two on-site inspections, determined that several factors indicated a lack of "flow" in these remaining waters. Specifically, as to the ditches and swales, the Corps noted that these "areas where flow was less than seasonal demonstrated thick matted vegetation with no evidence of a channel or ordinary high water mark." A.R. at 7. More importantly, the Corps determined that "these ditch and swale features convey[ed] water from ponds and surrounding upland areas during and following storm events and there [was] no evidence of groundwater recharge." *Id.* In other words, the Corps determined that the "flow" in these ditches and swales was ephemeral, flowing only after "storm events." Similarly, the Corps determined that the ponds were constructed to "maintain a certain water level" and would "flow" only if the water level increased above a certain point. *Id.* A photograph included in the Administrative Record supports

---

[19] Nevertheless, the Rapanos Guidance does indicate that "these waters will be evaluated under the significant nexus standard." Guidance at 7. The court notes that the Corps undertook such an analysis in this case, and the court's discussion of the Corps' significant nexus determination is below.

this conclusion, as it shows a raised culvert that would allow water to "flow" out of or exit the pond only if it increased to a heightened level–for example, from an influx of rainwater. *Id.* at 36 (Photo 5). Based on these observations and evidence, the Corps reasonably, and not arbitrarily or capriciously, concluded that these remaining ditches, swales, and ponds displayed no evidence of relatively permanent flow and were not "waters of the United States" under the plurality's "relatively permanent" waters test.

Deerfield also contends that the Corps arbitrarily and capriciously determined to end jurisdiction at a point within the second "jurisdictional" channel. Upon review, the court finds that this simply is not the case. To the contrary, Fennel and the Corps provided a thorough explanation as to why jurisdiction was not extended to the entire tributary. *See generally id.* at 5-7. The Corps concluded that the "pronounced difference between the two flow regimes . . . and their lengths, warranted treating them as different reaches because no one flow regime was an accurate characterization of the entire tributary." *Id.* at 6. With respect to the "non-jurisdictional" portion of the channel, the Corps noted a cessation of "the reach of continuous flow." *Id.* Additionally, the Corps observed thick and prevalent vegetation throughout the non-jurisdictional channel, a lack of sinuosity, and "no evidence of influence by the influx of groundwater." *Id.* Finally, and most importantly, Fennel observed that the channel "lacked an ordinary high water mark." *Id.* The Corps' relevant regulations provide that "[i]n the absence of adjacent wetlands, the jurisdiction extends to the ordinary high water mark." 33 C.F.R. § 328.4(c)(1); *see also Rapanos*, 547 U.S. at 761 (Kennedy, J., concurring) ("The Corps views tributaries as within its jurisdiction if they carry a perceptible 'ordinary high water mark.'"). Accordingly, the court finds that the Corps reasonably determined the point at which jurisdiction ended, based on a number of factors, and this

26

determination was neither arbitrary nor capricious.

  b.  Significant Nexus

  After determining that the remaining ditches, swales, and ponds were not jurisdictional under the "relatively permanent" waters test, the Corps further concluded that these remaining waters did "not have a significant nexus to a traditional navigable water." A.R. at 7. Deerfield contends that the Corps' significant nexus analysis was both arbitrary and capricious.

  Under the "significant nexus" test, in order to be "navigable" under the CWA, "a water or wetland must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Rapanos*, 547 U.S. at 759 (Kennedy, J., concurring). The Guidance states that the Corps will assert jurisdiction over tributaries of navigable waters if "the flow characteristics and functions of the tributary itself and the functions performed by any wetlands adjacent to the tributary . . . significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters." Guidance at 8. "Where a tributary has no adjacent wetlands, the [Corps] will consider the flow characteristics and functions of only the tributary itself . . . ." *Id.* at 10.

  Here, as discussed above, the Corps first identified all of the remaining water features on the Deerfield Tract–i.e., the ditches, swales, and ponds–and found no evidence of any existing or past wetlands. A.R. at 3-4; *see also* 33 C.F.R. § 328.3(b) (defining "wetlands" as "areas that are inundated or saturated by surface or ground water" and are home to "vegetation typically adapted for life in saturated soil conditions"). The Corps then analyzed the flow characteristics of these ditches and swales, and concluded that they have such a "low volume, duration and frequency of water flow" they lack a significant nexus to a traditional navigable water. A.R. at 7. The Corps

determined this lack of "flow," using all the same indicators as discussed above[20]–i.e., lack of an ordinary high water mark, thick and matted vegetation, "no evidence of groundwater recharge," and lack of sinuosity.[21] *Id.* at 6-7; *see also* Guidance at 10 ("Physical indicators of flow may include the presence and characteristics of a reliable ordinary high water mark (OHWM) with a channel defined by bed and banks."). Furthermore, the Corps determined that the ponds were constructed primarily to retain water and for aesthetic reasons, and that water flows out of the ponds only after storm events that cause their water levels to exceed a certain capacity. *Id.* at 7.

According to the Rapanos Guidance, in determining whether a significant nexus exists, the Corps will consider "hydrologic factors" and "ecologic factors." Guidance at 8. "Hydrologic factors" include, among other factors, "volume, duration, and frequency of flow, including consideration of certain physical characteristics of the tributary," and "proximity to the traditional navigable water." *Id.* "Ecologic factors" include, among other factors, "potential of tributaries to carry pollutants and

---

[20] *Supra* ¶. 13-14, 25-26.

[21] Deerfield contends that the Corps' "significant nexus" determination was arbitrary and capricious because the Corps failed to take specific measurements of flow. Specifically, Deerfield stated that "[t]he record in this case is entirely devoid of evidence to support the Corps superficial observations and conclusory determinations of flow." Deerfield Resp. in Opp. at 8. Citing *Precon*, Deerfield argues that "the Corps must undertake sufficient investigation and gather sufficient evidence to justify its jurisdictional conclusion, regardless of whether it finds for or against jurisdiction." *Id.* (emphasis removed).

    Although the Fourth Circuit in *Precon* did reverse and remand that matter after "find[ing] the Corps' administrative record [was] inadequate to support its conclusion that it [could assert] jurisdiction over Precon's wetlands," the present case is notably distinguishable as the Corps here did <u>not</u> attempt to assert jurisdiction over the remaining water bodies on the Deerfield Tract. *Precon Dev. Corp.*, 633 F.3d at 281. More importantly, the Fourth Circuit in *Precon* specifically addressed Deerfield's argument that specific measurements of flow are required. The Fourth Circuit stated in *Precon* that it "d[id] not intend to place an unreasonable burden on the Corps" and additionally "agree[d] that the significant nexus test d[id] not require laboratory tests or any particular quantitative measurements in order to establish significance." *Id.* at 296-97. Rather, the court indicated that "quantitative or qualitative" evidence could establish "significance." *Id.* at 296-97. Here, the Corps relied on such "qualitative" evidence–the physical indicators discussed above–in determining that the remaining waters had a low or minimal "flow." Accordingly, the court finds that Deerfield has failed to show that the Corps' significant nexus determination was arbitrary or capricious on this basis.

flood waters to traditional navigable waters" and "potential of wetlands to trap and filter pollutants or store flood waters maintenance of water quality in traditional navigable waters." *Id.*   After assessing these flow characteristics, the Corps is to determine "whether the tributar[ies] . . . are likely to have an effect that is more than speculative or insubstantial." *Id.* at 11.   In our case, the Corps determined that the ditches, ponds, and swales were designed primarily to retain water, and they contained "low volume, duration and frequency of water flow." A.R. at 7.   Based on these waters' low "flow" characteristics, their ability to *affect* downstream navigable waters is insubstantial and speculative, at best.   For example, with such minimal "flow," these waters are unlikely to "carry pollutants and flood waters to traditional navigable waters" or "significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters." Guidance at 8.

Accordingly, it was not arbitrary and capricious for the Corps to conclude that these remaining waters do "not have a significant nexus to a traditional navigable water because of the low volume, duration and frequency of water from these features, and [that they] therefore do[] not constitute 'waters of the United States.'" *Id.*

## Conclusion

Under the APA, "agency action, findings, and conclusions" will be set aside only when they are "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Ohio Valley Envtl. Coal.*, 556 F.3d at 192.   Further, "[r]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal.*, 556 F.3d at 192; *see also Natural Res. Def. Council, Inc.*, 16 F.3d at 1400.   For the reasons stated above, the court finds that the methodology and procedures used by the Corps to arrive at its decision, as well as its findings and conclusions, were reasonable and not

arbitrary and capricious.  Therefore, the court finds that the Corps' 2010 JD was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Accordingly, it is therefore **ORDERED** that Deerfield's [Docket Entry 52] Motion for Summary Judgment is **DENIED**, Deertrack's [Docket Entry 57] Motion for Summary Judgment is **DENIED**, the Federal Defendants' [Docket Entry 58] Motion for Summary Judgment is **GRANTED**, and this case is **DISMISSED** *with prejudice*.

        **IT IS SO ORDERED.**

                                    s/R. Bryan Harwell
                                   R. Bryan Harwell
                                   United States District Judge

Florence, South Carolina
July 12, 2011